Filed 9/13/22  P. v. Sekerke CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079015 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS304221) |
| KEITH WAYNE SEKERKE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge. Affirmed in part; reversed in part; remanded with directions.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Keith Wayne Sekerke of robbery (Pen. Code,[1] § 211; count 1); two counts of using personal identifying information of another (§ 530.5, subd. (a); counts 2 and 4); receiving stolen property (§ 496, subd. (a); count 3); two counts of burglary (§ 459; counts 5 and 11), grand theft automobile (§ 487, subd. (d)(1); count 6); receiving a stolen vehicle (§ 496d; count 7); unlawfully driving and taking a vehicle (Veh. Code, § 10851, subd. (a); count 8); and grand theft (§ 487, subd. (a); count 10).[2] Before trial, Sekerke pled guilty to attempted extortion (§ 524; count 12).

In a bifurcated trial, the court found true that Sekerke had suffered four prison priors (§ 667.5, subd. (b)), one serious felony prior (§ 667, subd. (a)(1)), and one strike prior (§§ 667, subd. (b)-(i), 1170.12, 668). The court also found true, in connection with counts 6, 7, and 8, that Sekerke suffered a prior theft conviction under section 496d and a prior vehicle theft conviction under Vehicle Code section 10851, within the meaning of the section 666.5, subdivision (a).

The court sentenced Sekerke to prison for a determinate term of 11 years eight months, consisting of the following: the middle term of three years for count 1, a concurrent middle term of two years for count 2, and one-third the middle term, or eight consecutive months each, for counts 3, 4, 10, and 12. The court imposed a consecutive, one-year term for count 6 (one-third the middle term) and a consecutive five-year term for the serious felony enhancement. However, the court struck the prior strike. In addition, the court selected the middle term for counts 7, 8, and 11 but stayed the sentence

_____

[1]    Statutory references are to the Penal Code unless otherwise specified.

[2]    The jury acquitted Sekerke on count 9 (obtaining the identifying information of 10 or more individuals with the intent to defraud) (§ 530.5, subd. (c)(3)).

on those counts pursuant to section 654. The court ordered Sekerke to pay a $10,000 restitution fine pursuant to section 1202.4, subdivision (b), along with other fines, fees, and assessments.

Sekerke appeals, arguing: (1) substantial evidence does not support his conviction for robbery; (2) the court prejudicially erred when it did not sua sponte instruct the jury on theft as a lesser included offense of robbery; (3) substantial evidence does not support his conviction for grand theft; (4) the trial court abused its discretion in denying his motion for a new trial; (5) he is no longer required to pay fees imposed under former Government Code section 29550.1 per Assembly Bill No. 1869; and (6) the fees and fines were improperly imposed because the court did not hold an ability to pay hearing and the punitive restitution fine was unconstitutionally excessive.

While this appeal was pending, we granted Sekerke's request to file a supplemental opening brief in which he argued this matter must be remanded for resentencing in connection with Assembly Bill Nos. 124 and 518 as well as Senate Bill No. 567. The People addressed these additional arguments in their respondent's brief.

As Sekerke argues, and the People concede, the portion of the judgment requiring Sekerke to pay fees under former Government Code section 29550.1 must be vacated. In addition, the parties agree that this matter must be remanded for resentencing under Assembly Bill No. 124. At that time, as the People point out, the trial court may consider the other recent changes to sentencing (specifically Assembly Bill No. 518 and Senate Bill No. 567) to the extent they apply to Sekerke. Regarding Sekerke's other contentions here, we conclude that the trial court erred in failing to sua sponte instruct the jury on the lesser included offense of theft. Accordingly, we conditionally reverse Sekerke's conviction for robbery. However, we conclude substantial evidence

3

does support the robbery conviction; so, the prosecution may retry Sekerke if it so chooses.

On remand, the trial court is to resentence Sekerke consistent with this opinion as well as the results of a retrial on the robbery count if the prosecution elects to retry that count. In resentencing Sekerke, the court should not impose a criminal justice administration fee and must consider the impact, if any, of Assembly Bill Nos. 124 and 518 as well as Senate Bill No. 567 on Sekerke's new sentence. Because we are remanding the matter for resentencing, we do not address Sekerke's challenge to the fees and fines imposed without an ability to pay hearing. At the resentencing, he may address that issue as well. In all other respects, we affirm the judgment.

FACTUAL BACKGROUND

*Smart & Final (August 21, 2018) - Counts 1 and 2*

Beatriz M. dropped off her son at the daycare at the YMCA in Chula Vista around 10:00 a.m. She left her stroller in the designated stroller parking area outside the child watch area with her diaper bag and the keys to her 2016 Honda Pilot in the stroller. When the childcare personnel called her about an hour later to let her know her son needed a diaper change, Beatriz went to retrieve the diaper bag and found the stroller and bag were missing. Beatriz informed the YMCA personnel about the missing articles because she thought another parent might have mistakenly taken the stroller. The employees checked the security video while Beatriz and two other employees went outside and saw that Beatriz's car was still in the parking lot. Beatriz went back inside, but within ten minutes, the employees came back and said her car was no longer there. Beatriz's purse was in the car behind the driver's seat. Inside the purse were Beatriz's ID, credit cards, and debit card, as well as her glasses and earrings. One of the credit cards

4

was in her husband's name. Beatriz contacted the police and reported the theft. She also contacted her husband, Gerardo G., who was working in Los Angeles at the time of the theft.

Gerardo had started calling the credit card companies to report the stolen cards when he received a text alert on his phone that one of the cards was being used at a Smart & Final in Chula Vista. He called the bank that issued the card and informed the bank that it was an unauthorized transaction. The card had been used to make two transactions at a Smart & Final, one for $155.95 and a second for $578.89.

Surveillance video of the theft of the stroller was played for the jury.

About twenty minutes after it was reported stolen, police found Beatriz's Honda Pilot at the Terra Nova shopping center on H Street in Chula Vista, about three miles away from the YMCA.

That same morning, Sekerke and a woman entered the Smart & Final and attempted to make a purchase using a credit card. Alma G. was in the employee break room when another supervisor called her for assistance because the identification presented did not match the cardholder information. The card was declined. When Alma told the woman that they could not accept the card, Sekerke approached the two employees who were standing behind the register. Sekerke lifted up his shirt to show what looked like a badge and told them he was an FBI agent, and they had to approve the transaction. Alma described Sekerke as "upset," "mad," and "very demanding." His voice was "very firm." Alma felt uncomfortable. Alma called the store manager, Dan P., over to the register.

Sekerke told Dan he felt disrespected because the other employees did not want to take his credit card. Sekerke was irate and "was being very loud." Sekerke was being very belligerent, and said, "This is fucking

5

bullshit. . . . I'm not going to stand for this no more. You guys are being idiots." His tone was very aggressive and angry.

Dan pulled him away from the registers and toward the back office in attempt to calm him. Sekerke told him he was a police officer, and he and his wife were undercover. Sekerke said his wife was going through chemotherapy; so, she did not look like the photo on the ID. Sekerke showed him a badge on a lanyard. The store clerk had given the proffered credit card and identification to Dan. The identification had a woman's name that matched the name on the credit card. Alma could not hear what Dan or Sekerke were saying, but Sekerke seemed upset and "there was a lot of back and forth."

After Dan spoke with him, Sekerke seemed to calm down. Dan told Sekerke he needed to verify the credit card and went into the office to contact the bank. When he called the bank, the person Dan spoke with told him the credit card was "fine," and that as long as the ID matched the credit card, the store was not liable for any unauthorized charges.

At some point, Sekerke stepped outside while the woman remained in the store. When Sekerke came back into the store about five or 10 minutes later, Alma saw what looked like a gun in a holster at his hip. Sekerke fidgeted with the holster once or twice, moving it around. After they saw the gun, Alma and the other employee moved farther away from Sekerke. Alma was scared and feared for herself and others in the store. She was afraid, based on Sekerke's demeanor, that he would use the gun. Alma described the incident as "very scary." She asked to go home afterwards and was shaking and crying.

When Dan came out of the office, Sekerke was by the registers. He was still irate and belligerent, demanding the phone number for the corporate

office, and cursing at the employees.  He was yelling and very loud.  Dan also noticed Sekerke was wearing what looked like a holstered gun on his right hip.  Although Sekerke's shirt was partially covering the gun, it was visible.  His first thought was that he needed to get Sekerke out of the store.  He did not try to call the police because he did not want to provoke Sekerke.  His biggest concern was to make sure Sekerke was calm and left the store.

Dan spoke with Sekerke again.  He seemed "pretty upset."  Dan described Sekerke as "even more belligerent."  According to Dan, the woman accompanying Sekerke was standing by the entrance telling Sekerke they should "just go," but Sekerke was insistent that he was not leaving without the groceries.  Dan decided to run the credit card so that they could "get rid of him," but when Sekerke inserted the card into the card reader, the card would not go through.  Sekerke then pulled out multiple credit cards and inserted another card into the card reader.  Dan did not run any checks on the second card and did not check the name or identification on the second card.  Dan did so because he wanted Sekerke out of the store.  According to Dan, Sekerke was "very irate, belligerent, and had a gun on him."[3]  As such, Dan explained that "even if he didn't have a credit card I would give him the stuff so he would leave."  Dan believed the gun was real and was afraid Sekerke would use it.  Dan said he was afraid and did not know what Sekerke was going to do.  He wanted to make sure Sekerke left the store.  Dan stated that when he came out of the office and noticed how aggressively Sekerke was acting, he thought Sekerke probably was not an officer based on

_____

[3]     Although this testimony can be interpreted multiple ways, from the remainder of Dan's testimony as well as that from the other witness in the store and the surveillance video, Dan was commenting on the fact that Sekerke had a gun on his person not that the gun was aimed at Dan.

his demeanor and actions.[4]  Dan gave the groceries to Sekerke mainly because of the gun and the holster.  If Sekerke did not have a gun, Dan would not have given him the groceries or allowed him to "run" the second credit card.  He did not check the second card because he was just hoping that Sekerke would leave.  The transaction on the second card was successful.  Two separate transactions using a card in the name of Gerardo were approved.  This was not the name on the card that Sekerke originally gave the cashier.  Sekerke left the store with the items.  Dan was shaken up by the incident.  He believed the gun was real.  Another employee, Evelyn, was so distraught she asked to go home.

After a couple minutes, Dan walked outside, intending to call police.  However, the police were already in the parking lot.  Dan talked with the officers and told them what had happened.  Dan told the officers that he thought Sekerke was law enforcement and was carrying a gun; however, Dan ultimately told the officers, "he wasn't sure" and that "it just didn't seem right."[5]

Surveillance video of the robbery was played for the jury.  Before Sekerke left the store and returned (while Dan was in the office), the video does not show Sekerke with a holster or weapon.  After Sekerke returned and Dan spoke with him a second time after calling the bank, a holster is visible in the video.  The badge is visible in the video, and at one point, Dan said it

---

[4]    Dan testified that he originally "kind of believed" Sekerke when Sekerke told him he was law enforcement.

[5]    At trial, the gun Sekerke carried was referred to as a "duty weapon."  It was unclear whether Dan ever referred to the gun in that manner.  Officer Lorenzo Ruiz testified that Dan "probably didn't term it a duty weapon" while explaining that duty weapon is "more a term law enforcement officers" use.

8

looked as if Sekerke pulled his shirt over the gun so that the gun would be more visible.

When Chula Vista Police Officer Lorenzo Ruiz reviewed the Smart & Final surveillance video, he recognized the man and woman involved from the YMCA surveillance video.

Later that week, Dan identified Sekerke from a photographic lineup.

An Airsoft BB gun that looked like a black, semiautomatic handgun and a holster were found during a search of Sekerke's residence. The BB gun was indistinguishable from a real firearm from a few feet away. Police also found a silver security enforcement badge in a leather holder on a lanyard that looked very similar to a police badge.

At trial, Dan identified the gun and holster as similar to the gun Sekerke was wearing inside the Smart & Final.

*Oak Lawn Avenue Stolen Property (August 28, 2018) - Count 3*

Based on the partial license plate from the YMCA video, police identified Sekerke as the registered owner of the Hyundai Veloster. Officer Ruiz obtained an address for Sekerke on Oak Lawn Avenue in Chula Vista. When he went to that address, the Hyundai Veloster was parked in the front driveway. While Ruiz was observing Sekerke's vehicle, Eric S., the property manager of the complex approached him and said he had been having problems with Sekerke, who was one of his tenants, and he told the detective that various home repair items had gone missing from a vacant residence in the complex.

After this discussion with Eric, Ruiz saw Sekerke pulling out of the driveway in the Hyundai and heading north toward the officer. When Ruiz stopped Sekerke and searched the vehicle, he found a California identification card and a gym membership card not belonging to Sekerke and

9

a Pontiac ignition key. A new, unopened Hansgrohe bar faucet was found in the rear passenger seat. A Kohler faucet, a light fixture, and a box containing several miscellaneous household items were found in the trunk. The items appeared to be new and were consistent with the items reported missing by the property manager. The box was addressed to Carol T., who was Eric's business partner. Eric later identified the items found in Sekerke's car as the items missing from the vacant residence.

*USE Credit Union (October 9, 2018) - Count 4*

Taige F. was working at PetSmart on Aero Drive on September 20, 2018, when she noticed her wallet was missing from her locker. Her license, social security card, credit card, and other items were in the wallet.

On October 8, 2018, personal items, including USE Credit Union checks, were stolen from a vehicle belonging to Grant and Victoria C. Taige does not know Grant or Victoria, and neither of them has ever written her a check.

Sekerke and a woman entered the USE Credit Union in Chula Vista on October 9, 2018, and attempted to cash a check from Grant and Victoria's account made out to Taige for $150. The woman gave the teller an ID with Taige's name on it, but the photograph on the ID did not look like the woman trying to cash the check. When the teller said she would have to verify the information, the woman left the credit union with Sekerke.[6]

Checks belonging to Grant and Victoria, including the check made out to Taige and the carbon copy of that check, were found at Sekerke's residence.

---

[6]    Sekerke is seen in surveillance video entering the credit union with, and interacting with, the woman who presented Grant and Victoria's check and Taige's ID.

10

*Target (October 10, 2018) - Counts 5 though 8*

Assistant manager Jasmine V. was working at Target in Mission Valley when she received a text notifying her that someone had just made a purchase at a gas station using her debit card. When she went to look for her card, she discovered her wallet and car key were missing from her fanny pack that she had left in the manager's office. Surveillance video from inside the store showed Sekerke entering the manager's office for a couple of minutes and then leaving the store. Exterior surveillance video showed a black car driving up and down the lanes of the parking lot, before setting off the alarm and stopping next to Jasmine's 2016 white Kia Rio. Two people exited the black car when it stopped and got into the Kia. The Kia drove away with the black car following it. The black car looked similar to Sekerke's Hyundai Veloster.

The key for the Kia as well as a college student identification card and a Visa debit card in Jasmine's name were found inside Sekerke's apartment. Her Kia Rio was parked in the carport assigned to Sekerke's residence with no license plate. Jasmine's car was valued at $23,000.

*Rady's Children's Hospital (October 8, 2018) - Counts 10-11*

Edward S. was working at the information desk at the front entrance to Rady Children's Hospital at around 10:00 p.m., when Sekerke and a woman approached the desk, told him they had an appointment with someone in administration, and asked directions to the administrative offices. Hospital administrative personnel are not usually at the hospital that late at night, but Edward gave directions to the building the couple was looking for. A few minutes after they left, Edward realized his Microsoft cellphone, valued at $120, was missing. The cellphone was later found in Sekerke's apartment.

A day or two later, the hospital security manager also received a report of a laptop missing from the hospital's education and office building. Surveillance video showed the woman reach down and pick something up from the area where Edward said his cellphone was placed. Video from inside the education and office building showed Sekerke and the woman walking in a second floor hallway before leaving the building. The laptop was taken from a cubicle on that floor. When they left, Sekerke was carrying a laptop bag. Security software installed on the laptop showed the laptop moving through the hospital and leaving through the front entrance. The stolen Dell laptop was also found in Sekerke's apartment.

Matthew K., the team lead for the department that purchases computers and software for Rady Children's Hospital, testified the stolen laptop had a value of "around $1400" including the value of both the hardware and of the software that was installed on each of the hospital's laptops. Matthew explained the laptop itself was valued at "a little over $900," and the Microsoft Office software license was $658 for each laptop. A quote generated from Dell on November 6, 2017, for the laptop alone, was "$909.53 after taxes and fee."

DISCUSSION

I

SUBSTANTIAL EVIDENCE

A. Sekerke's Contentions

Sekerke contends substantial evidence does not support his conviction for robbery or grand theft. As to robbery, he argues that the evidence was insufficient for a rational trier of fact to find beyond a reasonable doubt the elements of taking by force or fear and felonious taking. Regarding grand theft, Sekerke maintains the prosecution did not proffer sufficient evidence to

establish that the value of the stolen laptop exceeded $950. We reject these contentions.

## B. Standard of Review

We review challenges to the sufficiency of the evidence for substantial evidence. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 658 ["A judgment will not be reversed so long as there is substantial evidence to support a rational trier of fact's conclusion . . . ."]; see *People v. Gregerson* (2011) 202 Cal.App.4th 306, 320.) In so doing, we examine the entire record in the light most favorable to the judgment below. (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028.) We look for substantial evidence, which is evidence that is "reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078; *People v. Banks* (2015) 61 Cal.4th 788, 804), and we do not substitute our own factual determinations for the factfinder's (*Koontz*, at p. 1078). Further, " '[w]e do not reweigh evidence or reevaluate a witness's credibility.' [Citations.] 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support [a trial court's factual finding].' " (*People v. Brown* (2014) 59 Cal.4th 86, 106.)

## C. Robbery

Robbery is defined as " 'the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.' " (*People v. Burns* (2009) 172 Cal.App.4th 1251, 1258.)

Here, Sekerke claims that substantial evidence does not support the finding that he took property by force or fear. To this end, Sekerke

emphasizes that no witnesses testified that he took his gun out of the holster, called attention to the fact that he had a gun, or threatened anyone with harm. Sekerke's argument is not of the moment. Although calling attention to his gun, brandishing his gun, or threatening someone would all support his robbery conviction, Sekerke did not need to engage in any of those actions to satisfy the force or fear element of robbery.

At trial, the prosecution proceeded on the theory that Sekerke used fear to effectuate his robbery. " 'The element of fear . . . is satisfied when there is sufficient fear to cause the victim to comply with the unlawful demand for his property.' " (*People v. Morehead* (2011) 191 Cal.App.4th 765, 774, quoting *People v. Ramos* (1980) 106 Cal.App.3d 591, 601-602.) "It is not necessary that there be direct proof of fear; fear may be inferred from the circumstances in which the property is taken." (*Morehead,* at p. 775.) And "the victim need not explicitly testify that he or she was afraid." (*Ibid*.) Indeed, the victim's fear "need not be the result of an express threat." (*People v. Flynn* (2000) 77 Cal.App.4th 766, 771.) "Moreover, the jury may infer fear ' "from the circumstances despite even superficially contrary testimony of the victim." ' " (*Morehead*, at p. 775, quoting *People v. Davison* (1995) 32 Cal.App.4th 206, 215.) All that is required is that the defendant "used force or fear to take the property or to prevent the person from resisting." (*People v. Scott* (2009) 45 Cal.4th 743, 749, citing CALCRIM No. 1600; see *People v. Brew* (1991) 2 Cal.App.4th 99, 104 (*Brew*) [sufficient evidence of fear where cashier in retail store allowed the defendant to take money from cash register drawer after he stood close to her, without barrier or counter between them]; *People v. Prieto* (1993) 15 Cal.App.4th 210, 215-216 [finding sufficient evidence of fear as to the second woman where the defendant snatched both women's purses from lap of first woman in wheelchair, struggled with woman in wheelchair, and

14

second woman observed the struggle]; *People v. Garcia* (1996) 45 Cal.App.4th 1242, 1246 ["rather polite . . . 'tap' " of cashier sufficient where it caused cashier to fear defendant might be armed]; *Davison*, at p. 216 [victim is confronted by two men at an automatic teller machine and ordered to "stand back"].)

Sekerke admits that he was belligerent, used foul language, and threatened to call the store's corporate office while in Smart & Final. However, when his attempts to get store employees to accept the credit card proved unsuccessful, Sekerke left the store, and when he returned, a gun was holstered to his hip. And the employees noticed the gun as they moved away from Sekerke. In fact, Alma testified she was afraid for herself and others in the store because she thought, based on Sekerke's demeanor, he would use the gun. Moreover, she testified that the incident was "very scary," admitted that she was shaking and crying after the event, and asked to go home.

Sekerke attacks Alma's testimony as "neither reasonable nor relevant, serving no purpose but to emotionally sway the jury."[7] Yet, his arguments go to Alma's credibility and the weight the jury gave her testimony. As such, we summarily reject Sekerke's challenge to Alma's testimony here. (See *People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*) [" 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility' "].)

In addition, Dan's testimony about his interaction with Sekerke provides ample support for the taking by fear element of robbery. Although

---

[7] Sekerke's post hoc claim that Alma's testimony was irrelevant is not well taken. He does not indicate that he objected to the evidence at trial. Nor does he challenge its admissibility on appeal. (See *Avalos v. Perez* (2011) 196 Cal.App.4th 773, 776 ["As a general rule, a claim of error will be deemed to have been forfeited when a party fails to bring the error to the trial court's attention by timely motion or objection"].)

15

Dan testified that the credit card issuer told him he could authorize Sekerke's transaction without any liability, Dan came out of the office to find that Sekerke was still irate and belligerent, demanding the phone number for the corporate office, and cursing at the employees. At that time, Dan noticed Sekerke was wearing what looked like a holstered gun, visible on his right hip. Dan testified that his first thought was that he needed to get Sekerke out of the store. He explained that he did not try to call the police at that time because he did not want to provoke Sekerke. His most important concern was to make sure Sekerke was calm and left the store.

When Dan spoke with Sekerke the second time, Sekerke was "pretty upset" and "even more belligerent." Even though the woman with Sekerke urged him to "just go," Sekerke insisted he was not leaving without the groceries. Dan testified that he only decided to allow Sekerke to run the credit card again so that they could "get rid of him," but when Sekerke inserted the card into the card reader, the transaction was not approved. Despite the card being declined, Dan did not attempt to evaluate the second card or otherwise validate any ID associated with the second card. He simply wanted Sekerke out of the store. According to Dan, Sekerke was "very irate, belligerent, and had a gun on him." Dan explained, "And even if he didn't have a credit card I would give him the stuff so he would leave." Dan believed the gun was real and was afraid Sekerke would use it. Further, Dan testified that he gave the groceries to Sekerke mainly because of the gun and the holster. If Sekerke had not had a gun, Dan would not have given him the groceries or allowed him to attempt to use the second credit card. He was hoping that Sekerke would leave the store.

In addition to Alma's and Dan's testimony, the jury was shown a video of Sekerke's interaction with the employees at Smart & Final. Viewing the

16

trial evidence in the light most favorable to the conviction, we conclude there is sufficient evidence from which a reasonable juror could find beyond a reasonable doubt that the taking by force or fear element of robbery was proven. (See *People v. James* (1963) 218 Cal.App.2d 166, 170 ["If the record demonstrates adequate evidence from which the jury might have inferred the existence of either force or fear, the appellate court must affirm"].)

Sekerke also claims that substantial evidence does not support the felonious taking element of robbery. As such, he claims the record shows that Dan authorized the sales transaction, despite suspecting it was fraudulent, after his conversation with a bank representative and before seeing the gun on Sekerke's person. In other words, Sekerke argues that, at most, the evidence would support a conviction of theft by false pretenses, which does not satisfy the felonious taking element. (See *People v. Williams* (2013) 57 Cal.4th 776, 789-790 (*Williams*).) We reject this contention.

Theft by false pretenses requires that " '(1) the defendant ma[k]e a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transfer[ ] the property to the defendant in reliance on the representation.' [Citation.]" (*Williams*, *supra*, 57 Cal.4th at p. 787.) "[T]heft by false pretenses involves the *consensual* transfer of possession as well as *title* of property; therefore it cannot be committed by trespass." (*Id*. at p. 788.)

Sekerke's contention depends on this court accepting his argument that the taking by force or fear element was not satisfied. However, as discussed *ante*, we were not persuaded by that argument. Here, by attempting to use the stolen credit cards and identification to obtain goods from Smart & Final, Sekerke may have initially intended a theft by false pretenses. Nevertheless, the evidence at trial showed that the items were ultimately obtained from the

17

store through the use of fear and against the will of the store employees. Dan testified that he only allowed Sekerke to re-attempt the first card and the second card because of Sekerke's gun and his erratic and aggressive behavior. Accordingly, based on the evidence, the jury could reasonably find that Dan accepting the second card Sekerke handed him without question was not an act of consent (as required for theft by false pretenses) but in response to the fear he felt because of Sekerke's gun. Moreover, the jury could (and did) reasonably reject Sekerke's claim that Dan approved the transaction or gave Sekerke the items in reliance on the validity of the stolen credit card and identification offered by Sekerke. Indeed, Dan explained that he did not check the card or identification because he was afraid and wanted Sekerke out of the store. This evidence underscores that Dan did not consent to the transaction freely but did so only out of fear. Consequently, substantial evidence supports the conclusion that the taking here was a felonious taking and not theft by false pretenses.

## D. Grand Theft

To establish that Sekerke committed grand theft, the prosecution bore the burden of proving he stole property valued at more than $950. (§ 484; *People v. Grant* (2020) 57 Cal.App.5th 323, 328 (*Grant*).) Sekerke claims the prosecution failed to provide sufficient evidence to prove the laptop he stole had a value exceeding $950 at the time it was stolen.

Section 484, subdivision (a) requires the trier of fact to determine the value of property obtained by theft based on the property's "reasonable and

fair market value."[8]  "The fair market value of an item is 'the highest price obtainable in the market place' as between 'a willing buyer and a willing seller, neither of whom is forced to act.'  [Citations.]  'Put another way, "fair market value" means the highest price obtainable in the market place rather than the lowest price or the average price.'  [Citation.]  Fair market value is 'not the value of the property to any particular individual.' [Citation.]" (*Grant*, *supra*, 57 Cal.App.5th at p. 329.)

"Fair market value may be established by opinion or circumstantial evidence." (*Grant*, *supra*, 57 Cal.App.5th at p. 329.)  And jurors may also rely on their common knowledge in determining the value of an item.  (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1366.)

Here, Sekerke stole a Dell Latitude 5480 laptop.  The hospital security manager testified that he was given a quote of $897 as the cost of the laptop without software installed.  The hospital security manager attempted to testify regarding the value of the laptop with the installed software, but the court sustained defense counsel's foundation and hearsay objections.

Matthew K., the team lead for the end user services department, which provided desktop support within Rady Children's Hospital's IT department, also testified as to the value of the stolen laptop.  He explained that his duties included facilitating contracts with vendors, such as Dell and Microsoft.  As such, he would "put together contracts, pricing" to purchase

---

[8]  "[S]ection 484 . . . sets the ground rules for how theft crimes are adjudicated—for example, how various terms are defined, how value must be calculated, and how certain evidentiary presumptions operate. Specific theft crimes are set out in a variety of other sections, and courts have long required section 484's 'reasonable and fair market value' test to be used for theft crimes that contained a value threshold, such as violations of section 487, subdivision (a)." (*People v. Romanowski* (2017) 2 Cal.5th 903, 914.)

19

equipment, including laptops. In addition, he testified that he was aware of the prices paid for specific laptops that Rady Children's Hospital purchased. Based on his experience, Matthew testified that the value of the laptop was about $1,400 based on a $900 cost of the laptop and $658 for the Microsoft Office license for the laptop.

During cross-examination, Matthew explained the laptop alone was worth "a little more than $900," and the Microsoft Office software license was $658 for each laptop. Specifically, he referenced a quote from Dell for the particular laptop in the amount of $909.53 after taxes and fees. Sekerke's trial counsel, however, pointed out that Matthew did not bring any documents to trial to show what software had been installed on the stolen laptop. She also questioned Matthew about a document entitled: "Check out, Review, and Submit," which Matthew explained was a document used by departments when they want to order a laptop (laptops are purchased in a "bundle package"). Defense counsel noted that the document indicated that the "Microsoft Office program" cost $682 for a new laptop, and Matthew confirmed that was the current cost of for that program. Nonetheless, Matthew conceded that he did not bring to trial any document showing the cost of the program in October 2018 (when the laptop was stolen).

Here, Sekerke maintains that the evidence regarding the value of the stolen laptop was insufficient to establish that its value exceeded $950. To this end, he points out that the laptop was stolen on October 8, 2018, and Matthew testified at trial on September 10, 2019. Sekerke also emphasizes that the cost of the laptop was based on a quote provided by Dell on November 6, 2017, and the prosecution did not offer evidence regarding the cost of the Microsoft Office license near the time the laptop was stolen. Instead, Matthew testified that the "current cost" (at the time of trial) was

20

$682 and admitted he did not have any document with him showing the cost of the license in October 2018. In conclusion, Sekerke insists that "[t]he valuation evidence was conflicting and left room for doubt, consistent with the defense theory, that the value of the laptop did not exceed the $950 threshold."

As an initial matter, we find nothing "conflicting" regarding the evidence offered by the prosecution concerning the value of the stolen laptop. Two witnesses as well as a quote from Dell valued the laptop at around $900. And Matthew testified that the cost of the Microsoft Software license for the stolen laptop was $658. He also testified, based on a document used to order laptops at the time of trial, that the license for the software was $682 per laptop. Thus, the prosecution's evidence consistently valued the stolen laptop (with software) well above the $950 threshold needed for grand theft.

Further, Sekerke's challenge here appears to be focused more on the weight of the evidence than its sufficiency. At trial, with evidentiary objections, defense counsel successfully prevented the hospital security manager from testifying about the full value of the laptop. However, she made no such objections when Matthew testified. Nor would such objections have been well taken. Matthew's duties for Rady Children's Hospital required him to have knowledge of the pricing and purchasing of laptops. He therefore was qualified to testify as to the value of the stolen laptop. Rather than objecting on foundation or hearsay grounds (as she did when the security manager testified), Sekerke's trial counsel pointed out that Matthew did not bring in documentary evidence to corroborate his opinion as to the value of the stolen laptop. Counsel's arguments were aimed at the weight the jury should give Matthew's testimony, not whether Matthew was qualified to give an opinion as to the value of the stolen laptop. As discussed *ante*, we do

not reweigh evidence or reevaluate a witness's testimony. (*Albillar, supra,* 51 Cal.4th at p. 60.)

In summary, the jury heard testimony that the stolen laptop cost $909.53 (about a year before it was stolen), and the Microsoft Office license for the installed software was $658, for a total of $1,567.53. Although the value of laptop might have depreciated some since the time it was purchased, the jury, based on the evidence at trial, could have rationally concluded beyond a reasonable doubt that the value of the stolen laptop exceeded $950. Consequently, substantial evidence supports Sekerke's conviction for grand theft.

## II

## FAILURE TO SUA SPONTE PROVIDE A THEFT JURY INSTRUCTION

### A. Sekerke's Contentions

Sekerke asserts that the trial court prejudicially erred in failing to sua sponte provide a jury instruction regarding the lesser included offense of theft. He argues that the evidence to support the element of taking by force or fear for the crime of robbery was weak; thus, he was prejudiced because the jury was not given the option to convict him for theft. The People claim that there was insufficient evidence to support a theory of theft but not robbery. Sekerke has the better argument.

### B. Relevant Law and Standard of Review

"A trial court has a sua sponte duty to 'giv[e] instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' " (*People v. Eid* (2014) 59 Cal.4th 650, 656.) " '[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the

22

facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.' " (*People v. Licas* (2007) 41 Cal.4th 362, 366 (*Licas*); *People v. Gonzalez* (2018) 5 Cal.5th 186, 196-197 (*Gonzalez*).) " 'Theft is a lesser included offense of robbery.' " (*People v. Friend* (2009) 47 Cal.4th 1, 51.)

A trial court's asserted error in failing to instruct on a lesser included offense is reviewed de novo. (*Licas, supra,* 41 Cal.4th at p. 366.) In reviewing the record for this type of error, we view it in the light most favorable to the accused. (*People v. Woods* (2015) 241 Cal.App.4th 461, 475.) "[U]ncertainty about whether the evidence is sufficient to warrant instructions should be resolved in favor of the accused [citation]. Even evidence that is unconvincing or subject to justifiable suspicion may constitute substantial evidence and may trigger the lesser-included-offense requirement." (*People v. Vasquez* (2018) 30 Cal.App.5th 786, 792.) "The failure to instruct on lesser included offenses supported by substantial evidence" is reversible only when it is reasonably probable the accused would have received a more favorable result absent the error. (*Gonzalez, supra,* 5 Cal.5th at pp. 195-196. [applying the harmless error standard under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*)].) "The Supreme Court has emphasized 'that a "probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." (*People v. Soojian* (2010) 190 Cal.App.4th 491, 519.)

### C. Analysis

Viewed in a light most favorable to Sekerke, the record supports a theory that Sekerke procured the items from Smart & Final by theft. Theft is distinguished from robbery by the absence of the element of the use of force

or fear. (*People v. Waidla* (2000) 22 Cal.4th 690, 737; see *Williams*, *supra*, 57 Cal.4th at p. 799 [robbery includes all the elements of theft with " 'the additional element of force or fear' "].) At trial, the primary dispute between the parties was whether Sekerke had taken the items from Smart & Final with force or fear. Indeed, at the beginning of defense counsel's closing, she conceded that Sekerke had committed a crime at Smart & Final: "I think when you look at the bulk of these crimes . . . what occurred at Smart and Final, and with the fraudulent use of the card and with the credit union—I think that the evidence is sufficient that Mr. Sekerke is guilty of those crimes." However, counsel made clear to the jury that "the main dispute . . . is the existence of a robbery."

Sekerke's trial counsel later emphasized, during her closing, the absence of fear during the Smart & Final event. To this end, counsel stated:

> "But that young man who was with the defendant the entire time never shows any alarm, any fear, any concern. No one does in that entire footage. No one is acting like it's a robbery. It was never reported to be a robbery. Nobody is behaving like it's a robbery. Nobody said it was a robbery until they came to court."

Defense counsel also spent a substantial amount of time during her closing arguing why Dan (the victim of the robbery) was not credible. And because the presence of the gun on Sekerke's person was the focus of the prosecution's argument that Sekerke committed a robbery, counsel explained why Sekerke had the gun. She argued:

> "In fact, the story the defendant came up with, being law enforcement, to try to convince the clerks to go ahead and honor this fraudulent credit card, was actually one designed to lessen the threat of the gun because the gun became part of his costume, along with the badge. [¶] So anybody listening to that would have behaved exactly the

24

way you see them behaving in this surveillance footage. Unconcerned. And that is why we're here."

Despite Sekerke's trial counsel's focus on a lack of fear during the Smart & Final event, the People maintain there was no need for the court to provide the jury with a theft instruction because when "there is no proof, other than an unexplainable rejection of the prosecution's evidence, that the offense was less than that charged, such instructions shall not be given. [Citations.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1063.) Yet, there was proof presented at trial that Sekerke committed theft in Smart & Final and not robbery. The record shows that Sekerke attempted to use a stolen credit card (and ultimately was successful in doing so) to obtain the items at Smart & Final. He told store employees that he was law enforcement. His attorney argued that the presence of the gun was merely part of his guise. In fact, Sekerke's trial counsel conceded at the beginning of her closing argument that Sekerke committed theft in Smart & Final. The primary issue as to robbery was Sekerke's use of fear to take the property. Against this backdrop, we conclude this was not an all or nothing case of robbery. Yet, it was presented as one to the jury.

Sekerke asserts the instant action is analogous to *Brew, supra,* 2 Cal.App.4th 99. There, the appellant walked behind the counter at a drug store and took money from the register. The store clerk who was at the register testified that "[a]s she was placing the money into the drawer, appellant 'came inside' the register area. Scared, [she] moved away from the register. Appellant then lifted the register drawer and confiscated money, checks and credit card charge slips from underneath the drawer. In the process of doing this, he said nothing to [the clerk]. Nor did he touch her." (*Id.* at p. 103.) The appellant argued that the court had erred by instructing the jury only on robbery and not on the lesser included offense of grand theft.

The appellate court agreed and reversed, holding that the trial court was required to instruct on the lesser offense. "[T]here is sufficient evidence to sustain a finding that appellant's offense as against [the clerk] was committed through use of fear or intimidation. However, arguably, the evidence would support a finding that the offense was committed without these elements being present. In his defense at trial, appellant argued strongly against a finding of fear or force. In the case of [the clerk], defense counsel told the jury: 'She communicated to you that she was scared. But is it the type of force or fear required that the People have to prove beyond a reasonable doubt, a 211, or is it the shock of somebody reaching and making an unexpected movement toward the cash register drawer?' It is this question which was imperative for the jury to determine on count two. An instruction on grand theft by larceny would have insured that the jury confronted it head-on." (*Id*. at p. 105.)

Here, the People argue that *Brew* is not instructive because "there was no ambiguity as to the use of force or fear." We disagree. Although we concluded *ante* that there was substantial evidence supporting the jury's conviction that Sekerke took the items through fear, our conclusion did not involve a determination that the evidence was unambiguous. Indeed, as part of our analysis, we did not consider whether the evidence was uncontradicted. Rather, we examined the record in the light most favorable to the judgment below. (*People v. Becerrada, supra,* 2 Cal.5th at p. 1028.)

Sekerke was belligerent in the Smart & Final after the employees would not accept the card his female companion offered. He cursed at the employees. He threatened to call the corporate office to complain. He told employees he was law enforcement, displayed a badge, and demanded they approve the transaction. At some point, he left the store and returned with a

26

gun in a holster on his hip. There is no indication in the record that Sekerke pulled up his shirt to expose the gun or threatened anyone with the gun. At most, Alma testified that Sekerke "fidgeted with the holster[,]" which consisted of him "just kind of . . . moving it around." Alma stated that Sekerke fidgeted with the holster "once or twice." However, on cross-examination, Alma admitted that she observed Sekerke fidget with the holster "as he was walking back in" the store, and she did not believe that Dan had returned from calling the bank about the credit card to see it. She also clarified that she was about 20 to 22 feet away from Sekerke when he fidgeted with the holster, and he was not looking in her general direction when he did so. In addition, Alma admitted that, although she believed Sekerke had a gun, she never saw a gun and she could not be sure that Sekerke did not have the holster the first time he entered the store. Further, the victim of the robbery, Dan, did not testify that Sekerke fidgeted with the holster or otherwise drew his attention to the gun.

In light of this record, we believe *Brew*, *supra*, 2 Cal.App.4th 99 is instructive in the instant action. Like in *Brew*, the only point of contention regarding the robbery claim here is whether the fear Dan testified he experienced was sufficient for the jury to find, beyond a reasonable doubt, that Sekerke committed robbery. Like the appellate court in *Brew*, we are concerned that the lack of a theft jury instruction did not cause the jury to confront the question "head-on." (*Brew*, at p. 105.) Our concern is heightened on the record before us because defense counsel conceded that Sekerke committed a crime while in Smart & Final but argued it was not robbery. Thus, the jury was faced with a situation in which the prosecution and the defense agreed a crime was committed but disagreed on the actual crime. Because the jurors were only provided a jury instruction on robbery,

27

they had to choose between finding Sekerke guilty of that crime or nothing at all. They were not given the opportunity to convict him of the lesser included offense of theft, which is supported by the evidence. Therefore, applying the *Watson* standard of harmless error, it appears reasonably probable that the result would have been more favorable to Sekerke absent the error, especially when a more favorable result would be a single juror finding Sekerke guilty of theft, not robbery. (See *People v. Soojian*, *supra*, 190 Cal.App.4th at p. 520 [under the *Watson* standard, "a hung jury is considered a more favorable result than a guilty verdict"].)

However, as Sekerke's trial counsel conceded during her closing argument, and the record bears here, that all the elements of theft were satisfied by Sekerke's actions in the Smart & Final. Because the value of the goods taken did not exceed $950, the crime of petty theft was committed.[9] (See §§ 487, subd. (a), 488.) "When a greater offense must be reversed, but a lesser included offense could be affirmed, we give the prosecutor the option of retrying the greater offense, or accepting a reduction to the lesser offense." (*People v. Kelly* (1992) 1 Cal.4th 495, 528.) We therefore conditionally reverse Sekerke's conviction for robbery. (See § 1260; *People v. Edwards* (1985) 39 Cal.3d 107, 118 [" 'An appellate court is not restricted to the remedies of affirming or reversing a judgment. Where the prejudicial error goes only to the degree of the offense for which the defendant was convicted, the appellate court may reduce the conviction to a lesser degree and affirm the judgment as

---

9    The record shows that Sekerke took from Smart & Final goods totaling $734.84.

modified, thereby obviating the necessity for a retrial' "]; *People v. Sanchez* (2013) 221 Cal.App.4th 1012, 1028; *People v. Woods* (1992) 8 Cal.App.4th 1570, 1596.) As such, on remand, the prosecutor can elect to retry Sekerke on the robbery count or accept a reduction to petty theft for count 1.

III

SEKERKE'S MOTIONS FOR MISTRIAL AND A NEW TRIAL

A. Sekerke's Contentions

Sekerke contends that the trial court abused its discretion in denying his motions for mistrial and a new trial after a prosecution witness disclosed Sekerke's criminal history in violation to the court's order on a motion in limine. We disagree.

B. Background

Before trial, Sekerke filed a motion in limine to exclude evidence of his prior convictions as impeachment evidence or to sanitize the prior convictions to avoid prejudice to him. The prosecution sought to introduce evidence of four of Sekerke's prior convictions as impeachment evidence if Sekerke chose to testify. Defense counsel asked that the evidence be limited to three of the prior convictions. After discussions with counsel, the court agreed that evidence of three of Sekerke's prior convictions would be admitted as impeachment evidence if Sekerke testified or if the defense offered character witnesses. In addition, the court granted the defense motion to bifurcate the trial of the prior conviction allegations.

Before trial began, the court instructed the jurors they were to disregard any answer that was stricken by the court and were not to consider the information for any purpose.

During the prosecution's direct examination of Detective Doru Hansel, the prosecutor asked how law enforcement identified the man seen in the

29

USE Credit Union surveillance video. That question led to the following exchange:

> "Q: Using that identification, the identity of the female, were you able to use that to determine who the male was?
>
> "A: Yes.
>
> "Q: Were you able to determine if—well, how did you do that?
>
> "A: So Ms. Donovan had a felony warrant. I looked her up on Facebook, found a few accounts for her. [¶] And one of the accounts, on her list of friends, she [had] a friend listed by the name of Keith Sekerke, and the picture on the Facebook was the male I saw walking in the bank with Ms. Donovan. So I took that name from the Facebook account and conducted a records check. I found an extensive criminal history—
>
> "[Defense counsel]: Your honor, move to strike.
>
> "THE COURT: Sustained.
>
> "[Defense counsel]: Last portion of the answer, ask that the jury be instructed to disregard it.
>
> "THE COURT: The last sentence will be stricken. Jury to disregard.

Later during Hansel's direct examination, the prosecutor asked if Sekerke was arrested the same day his residence was searched. Hansel responded, "He was arrested by National City for, I think, probation violation or a warrant." The trial court again sustained the defense objection and struck the answer.

At the end of Hansel's direct examination, the trial court asked to see counsel at sidebar. The court noted that the witness had twice mentioned Sekerke's prior criminal record, despite the pretrial ruling that Sekerke's prior convictions would be admitted only as impeachment evidence if Sekerke

testified. When the court asked the prosecutor whether he had advised the witness of the court's ruling, the prosecutor said he did not believe he told the witness anything specific about mentioning Sekerke's criminal history but that he had not anticipated the detective volunteering the testimony about Sekerke's criminal history that came out in response to the questions asked.

Sekerke's trial counsel then moved for a mistrial, arguing that Sekerke was inclined not to testify so that his past record was not placed before the jury, but that the issue had now been mentioned twice in Hansel's testimony.

The trial court denied the motion, but reminded the prosecutor he had an ethical obligation to advise witnesses regarding the court's pretrial rulings and admonished the detective to refrain from further mentions of Sekerke's criminal history, noting that a mistrial would be granted if it was mentioned again.

Before jury deliberations, the trial court's instructions included the following:

> "If I sustained an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did.

> "If I ordered testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose."

After the jury reached its verdict, Sekerke filed a motion for a new trial based on the prosecutor's misconduct in eliciting the testimony that Sekerke had "an extensive criminal history." The trial court denied the motion for a new trial, noting that any prejudice from the remarks had been cured by the admonitions and instructions given and finding Sekerke suffered no prejudice given the evidence at trial. The court made clear that the prosecutor should have admonished the witness to refrain from mentioning any criminal history

31

and that she was troubled by the prosecutor's and Hansel's actions. Nevertheless, the court concluded Sekerke was not prejudiced and explained its reasoning as follows:

> "So I want the record to be clear, I do not condone what happened, and I ruled at the time that based on the Court immediately admonishing the jury on both occasions and immediately striking the testimony and telling them to disregard it, that I had cured any issues with it. And now I went over and reviewed the record again on this issue of was Mr. Sekerke prejudiced.

> "In my view, when you have a consolidated case like this where you have multiple incidents for multiple days, these cases are built in 1101-type prior criminal act cases in that the jury sees a crime spree over a period of days where everything was on videotape. Mr. Sekerke and his co-defendants were doing numerous criminal acts right on video for the jury to see, and so it's built in to a case like this that the jury—well, he clearly did the baby stroller, and then he clearly did this robbery charge. So it—it's just the way jurors think about a case where the evidence is so clear and so overwhelming, everything on video surveillance.

> "Like I said, I reviewed the trial—my trial notes, and these witnesses were excellent witnesses and what they observed was 100 percent corroborated by the videotape evidence. So for me to assess that there was prejudice from this one statement that was excluded, if this had been one charge in the abstract and they'd heard that he had this extensive record, maybe there would be a more legitimate argument. But in a case of this nature with 11 charges and the jury came back with guilty verdicts on 10 out of 11, and frankly, it did not surprise this Court at all what their verdicts were because, as it is many times in modern American society, crime is being committed and there's a video showing the crime.

> "So I cannot find, based on this record, that [Sekerke] was prejudiced. I don't want to in any way say that justifies

32

that this conduct happened, and in the future, [Prosecutor], you better be informing every witness in your case the rulings that this Court makes before you put them on the witness stand. But I deny the motion on that basis."

## C. Standard of Review and Relevant Law

Sekerke based his motions for mistrial and a new trial on alleged prosecutorial misconduct.[10] A prosecutor's behavior " ' "violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

As relevant here, a prosecutor " 'has the duty to see that the witness volunteers no statement that would be inadmissible and especially careful to guard against statements that would also be prejudicial.' " (*People v. Schiers* (1971) 19 Cal.App.3d 102, 113.) This includes the duty to warn the witness against volunteering inadmissible statements. (See *People v. Warren* (1988) 45 Cal.3d 471, 481-482.)

A witness's volunteered statement containing inadmissible evidence can provide grounds for a mistrial or a new trial when the trial court find the

---

10    " '[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

statement resulted in incurable prejudice. (*People v. Wharton* (1991) 53 Cal.3d 522, 565.) Exposing a jury to a defendant's criminal record can prejudice the defendant's case. (Cf. *People v. Price* (1991) 1 Cal.4th 324, 431.)

"[W]e review a ruling on a motion for mistrial for an abuse of discretion, and such a motion should be granted only when a party's chances of receiving a fair trial have been irreparably damaged." (*People v. Ayala* (2000) 23 Cal.4th 225, 283.) Similarly, we apply the abuse of discretion standard of review when reviewing the denial of a motion for a new trial that is based upon alleged prosecutorial misconduct. (*People v. Thompson* (2010) 49 Cal.4th 79, 140.)

### D. Analysis

Here, we have the benefit of a thorough record in which the trial court addressed the alleged prosecutorial misconduct and explained how it dealt with the issue at trial and why it did not grant a motion for a new trial. In addition to sustaining defense counsel's objections, striking Hansel's testimony, and admonishing the jury to disregard the testimony, the court clearly indicated that it took the issue "seriously" and was "furious" about Hansel's testimony. The court "blame[d]" both the prosecutor (for not telling Hansel that he could not discuss Sekerke's criminal record) and Hansel (finding it "troubling" that "a person with 14 years' experience in law enforcement would just start pontificating on a person's criminal record in front of the jury"). However, the court disagreed with defense counsel's suggestion that the prosecutor elicited the improper testimony on purpose, noting Sekerke's criminal record "wasn't even material to the question."

With this background in mind, it is clear that the court found the prosecutor had committed misconduct by not informing a witness that he could not testify about Sekerke's criminal record consistent with the court's

motion in limine ruling (see *People v. Warren*, *supra*, 45 Cal.3d at pp. 481-482; *People v. Schiers*, *supra*, 19 Cal.App.3d at p. 113), which resulted in a witness testifying about inadmissible evidence. We conclude the court did not abuse its discretion in making such a finding. (*People v. Peoples* (2016) 62 Cal.4th 718, 792-793 ["We review the trial court's rulings on prosecutorial misconduct for abuse of discretion"].)

However, the court carefully explained why it did not find that Sekerke had been prejudiced to warrant a mistrial or a new trial. To this end, the court emphasized that Sekerke faced 11 counts, "the evidence [was] . . . clear and . . . overwhelming," Sekerke was "doing numerous criminal acts right on video for the jury to see," and the "witnesses were excellent witnesses and what they observed was 100 percent corroborated by the videotape evidence." In light of the mountainous evidence of Sekerke's guilt, the court concluded that it could not "assess that there was prejudice from this one statement that was excluded."[11]

We determine the trial court's conclusion is clearly supported by the record before us. Indeed, defense counsel spent most of her time in closing argument challenging only three of the 11 counts and focusing most on robbery and grand theft. Further, the trial court decisively dealt with the issue during trial by sustaining the objections, striking the testimony, and admonishing the jury at the time of the testimony as well as before the jury began deliberations. "In the absence of any evidence to the contrary, we

---

[11]  Sekerke claims the trial court did not grant his motion for a mistrial or a new trial simply because the court found the prosecutor did not elicit Hansel's inadmissible testimony and instructed the jury to disregard Hansel's statements. This argument is not based on a fair reading of the record, and we summarily reject it.

presume the jury heeded the admonition." (*People v. Burgener* (2003) 29 Cal.4th 833, 874.)

In short, we agree with the trial court that Sekerke was not prejudiced by the prosecutor's misconduct at trial. We therefore conclude the trial court did not abuse its discretion in denying Sekerke's motions for mistrial and a new trial.[12]

## IV

### THE CRIMINAL JUSTICE ADMINISTRATIVE FEE

Pursuant to Assembly Bill No. 1869, Government Code section 6111 repealed Government Code section 29550 in part to "eliminate all outstanding debt incurred as a result of the imposition of administrative fees." (Assem. Bill No. 1869 (2019-2020 Reg. Sess.) § 2; Gov. Code, §§ 6111, 29550.) Government Code section 6111 provides, "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to Section 27712, subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Gov. Code § 6111, subd. (a).) It further specifies that, "This section shall become operative on July 1, 2021." (*Id.*, subd. (b).)

In *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 953 (*Lopez-Vinck*), the court interpreted Assembly Bill No. 1869 and held that "[b]y specifying the precise date on which the costs that have been imposed . . . become unenforceable and uncollectible, the Legislature made clear that any

---

[12] In arguing that he was prejudiced by the misconduct, Sekerke focuses entirely on his robbery conviction. As we determined *ante*, substantial evidence supports the robbery conviction. However, that conviction must be reversed because of instructional error.

amounts paid prior to that time need not be vacated." The court further held that the defendant was not entitled to a vacatur of all fees the defendant paid prior to July 1, 2021. (*Lopez-Vinck*, at p. 953.) However, the defendant received a vacatur of the criminal justice administrative fee that remained unpaid as of July 1, 2021, and the court instructed the trial court to modify the judgment consistent with the vacatur. (*Ibid.*)

At sentencing, the trial court ordered Sekerke to pay a $154 criminal justice administrative fee per former Government Code section 29550. The parties acknowledge that, under Assembly Bill No. 1869, as of July 1, 2021, Sekerke's unpaid balance of $154 became "unenforceable and uncollectible." (*Lopez-Vinck*, *supra*, 68 Cal.App.5th at p. 951.) We agree with the parties. However, because we will be vacating Sekerke's sentence and remanding this matter for retrial on count 1 and Sekerke eventually will be resentenced, the trial court should follow Assembly Bill No. 1869 during that resentencing hearing. In other words, the trial court may not order Sekerke to pay a criminal justice fee.

V

CHANGES IN SENTENCING LAWS

In supplemental briefing, Sekerke contends remand and resentencing are required pursuant to three legislative enactments that became effective while this appeal was pending: Assembly Bill No. 124 (2021-2022 Reg. Sess.), Assembly Bill No. 518 (2021-2022 Reg. Sess.), and Senate Bill No. 567 (2021-2022 Reg. Sess.). Among other changes, Assembly Bill No. 124 sets a presumption that the trial court "shall order imposition of the lower term if any of the [enumerated circumstances] was a contributing factor in the commission of the offense." (§ 1170. subd. (b)(6).) These circumstances include when the "person has experienced psychological, physical, or

37

childhood trauma, including but not limited to, abuse, neglect, exploitation, or sexual violence." (*Id.*, at subd. (b)(6)(A); Stats. 2021, ch. 695, § 5.3.)

Senate Bill No. 567 amended section 1170 such that the trial court may only impose the aggravated term where aggravating circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt at a jury or court trial.[13]  (§ 1170, subds. (b)(1) & (2).)

Assembly Bill No. 518 amended section 654 to give trial courts discretion not to impose the provision providing for the longest term of imprisonment.  (§ 654, subd. (a).)

The People concede the enactments apply retroactively to this case, as it was not final on appeal before the enactments became effective on January 1, 2022.  (See *In re Estrada* (1965) 63 Cal.2d 740.)  Specifically, they point out that the trial court now must consider whether Sekerke's psychological or childhood trauma was a contributing factor to the commission of the crimes within the meaning of Assembly Bill No. 124.  We agree.  We assume, absent evidence to the contrary, that an amendatory statute "mitigat[ing] the possible punishment for a class of persons" is "presumptively retroactive and applie[s] to all persons whose judgments [are] not yet final at the time the statute [takes] effect." (*People v. Frahs* (2020) 9 Cal.5th 618, 624; see *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038 [concluding Assembly Bill No. 124 retroactively applies to the defendant and remanding for resentencing].)

Because we have determined the matter must be remanded in light of Assembly Bill No. 124, we need not address whether Assembly Bill No. 518 or

---

[13]    In addition, the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior conviction to a jury.  (§ 1170, subd. (b)(3).)

Senate Bill No. 567 may affect Sekerke's sentence.  However, we note the general rule that on remand the trial court may revisit all of its prior sentencing decisions.  (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["[T]he full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"]; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 893 [under the full resentencing rule, when part of a sentence is stricken, a remand for a full resentencing is appropriate to allow the trial court to exercise its sentencing discretion in light of the changed circumstances].)  Because Assembly Bill No. 518 and Senate Bill No. 567 apply retroactively, the trial court should consider these legislative changes when resentencing Sekerke.  We express no view as to how the trial court should exercise its discretion on remand.

## VI

## THE ABSENCE OF AN ABILITY TO PAY HEARING

At sentencing, the trial court imposed a $10,000 restitution fine (§1202.4, subd. (b)), a $10,000 parole revocation fine, which was stayed unless parole is revoked (§ 1202.45), a $440 court security fee (§1465.8), a $330 criminal conviction assessment (Gov. Code, § 70373,) and a $39 theft fine with penalty assessments (§ 1202.5).

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, Sekerke contends that imposition of these various fines, fees, and assessments, without a determination of his ability to pay, violated his constitutional right to due process.  He contends his case should be remanded to allow the trial court to determine whether he has the ability to pay these amounts.  We conclude this claim is moot because we already have determined this matter must be remanded for Sekerke to be retried on the robbery count (if the prosecution elects to do so) and be fully resentenced in any event.  If Sekerke

39

so chooses, he may address the imposition of any fees or fines during his resentencing hearing.

## DISPOSITION

Sekerke's sentence is vacated and his conviction for robbery (count 1) is reversed with the following directions: If the People do not retry Sekerke for robbery pursuant to section 1382, subdivision (a)(2), within 60 days after the remittitur is filed or if the People file a written election not to retry Sekerke, the trial court shall proceed as if the remittitur modified the judgment to reflect a conviction for petty theft rather than for robbery on count 1 and resentence Sekerke consistent with this opinion (including considering Assembly Bill Nos. 124 and 518, and Senate Bill No. 567). If the People elect to retry Sekerke, then the court shall sentence Sekerke based on the results of that retrial and consistent with this opinion (including considering Assembly Bill Nos. 124 and 518, and Senate Bill No. 567). At the eventual sentencing hearing, Sekerke may request an ability to pay hearing. In all other respects, the judgment is affirmed. After resentencing, the trial court

is directed to prepare an amended abstract of judgment and send a certified copy of same to the Department of Corrections and Rehabilitation.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


BUCHANAN, J.


41